IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 13-cv-02326-NYW

CYNTHIA R. SMITH,

                    Plaintiff,

v.

CAROLYN W. COLVIN,

                    Defendant.

---

## MEMORANDUM OPINION AND ORDER

---

Magistrate Judge Nina Y. Wang

This action comes before the court pursuant to Title II of the Social Security Act ("Act"), 42 U.S.C. §§ 401-33 for review of the Commissioner of Social Security's ("Commissioner" or "Secretary") final decision denying Plaintiff, Cynthia R. Smith's, application for Disability Insurance Benefits ("DIB"). Pursuant to the Order of Reference dated May 6, 2014 and the Order of Reassignment dated February 10, 2015, this civil action was referred to the Magistrate Judge "for all purposes" pursuant to the Pilot Program to Implement the Direct Assignment of Civil Cases to Full Time Magistrate Judges and Title 28 U.S.C. § 636(c). [*See* #26 and #27]. The court has carefully considered the Complaint filed August 29, 2013 [#1], Defendant's Answer filed December 4, 2013 [#14], Plaintiff's Opening Brief filed February 3, 2014 [#17], Defendant's Response Brief filed March 31, 2014 [#21], Plaintiff's Reply Brief filed April 21, 2014 [#22], the entire case file, the administrative record, and applicable case law. For the following reasons, I affirm the Commissioner's decision.

# PROCEDURAL HISTORY

In January 2008, one month shy of her 50th birthday, Ms. Smith filed an application for DIB under Title II of the Act. [*See* #15-5 at 207-209; #15-2 at 48].[1] Ms. Smith is a high school graduate and has completed one year of college. [*See* #15-2 at 48]. Plaintiff alleges she became disabled, or unable to work, on March 31, 2002, at the age of 44 when cancer was detected in her right breast. She had previously undergone treatment for cancer in her left breast, including chemotherapy, mastectomy, a tram flap reconstruction, and right breast reduction. [#15-9 at 490]. Prior to March 2002, Ms. Smith worked for Sears as a shoe sales person, and for Focus on the Family as a janitor and later as an office helper in their cassette department. [#15-2 at 55-56, 77-78]. Administrative Law Judge Kathryn D. Burgchardt ("ALJ") denied Ms. Smith's application after two administrative hearings, held in November 2009 and November 2011, at which Plaintiff was represented by counsel. [#15-2 at 12-24, 30-43, 90-103].

At the 2009 hearing, Plaintiff testified that her health then was worse than in December 2007 because more issues had arisen, but was unable to describe her health between the period of March 31, 2002 and December of 2007. [#15-2 at 49]. She testified that following her mastectomy and transplant reconstruction in June 2003, she has trouble standing at times and lifting heavy objects:

> [the doctors] did a mastectomy and…a trams flap reconstruction on both
> [breasts]…they took the tissue out of my back, so my back stresses out really
> quickly…My right arm, they took out some lymph nodes and there's still a few
> there, but it still flares up…if I lift something too heavy…the pain gets
> excruciating.

---

[1] The court uses this designation to refer to the ECF document number and the page number of that document, or where applicable, the page number of the Administrative Record as provided by the Parties.

[#15-2 at 63-64].  Ms. Smith further testified that to relieve her back pain, she would lie down with an ice pack or heat pad and takes prescribed pain medication.  [#15-2 at 68].  Ms. Smith also testified that following the surgery she experienced mood swings, including feeling angry without reason, and fatigue.  [#15-2 at 65-67].  Her husband, Dennis Smith, testified that following Ms. Smith's operation she was "completely weak. There was lots of things she couldn't do [sic]," and that he assumed care of the home including "cleaning, laundry, mowing the lawn…making dinners, washing the dishes."  [#15-2 at 73].  Mr. Smith further testified that Plaintiff became winded much easier and would need to rest after every half hour of activity, such as grocery shopping or a walk, but "any kind of activity, as long as she could sit through it, she was fine."  [#15-2 at 75].

Finally, Mr. Rauer testified as a vocational expert ("VE").  The ALJ posed three hypothetical scenarios to the VE.  First, she questioned whether jobs exist for a person of Plaintiff's age, education, and work experience with the following limitations: lifting or carrying no more than 10 pounds frequently and 20 pounds occasionally; standing or walking with normal breaks for a total of 6 hours in an 8-hour workday; pushing and pulling with upper and lower extremities within the same weight restrictions; balancing and stooping occasionally; and never climbing ladders, ropes, or scaffolds.  [#15-2 at 78-79].  The VE testified that an individual with those limitations could function in Plaintiff's former roles as shoe salesman and an office helper, and could also serve as a small product assembler, dispatcher, gate guard, and storage facility rental clerk.  [#15-2 at 79-80].  The ALJ posed a second hypothetical in which she changed the restrictions as follows: lifting or carrying less than 10 pounds frequently and up to 10 pounds occasionally; standing or walking with normal breaks for a total of 2 hours in an 8-hour workday; and sitting with normal breaks for a total of 6 hours in an 8-hour workday.  [#15-2 at

80].   The VE testified that such an individual could not perform as a shoe salesman, office helper, gate guard, or storage facility rental clerk, but could perform as a small product assembler "with an erosion of about 25 percent, which would bring our national numbers down to about 280,000…and in Colorado, it would bring us down [to] about 2,700 positions," as a dispatcher, and as a call-out operator.   [#15-2 at 81-82].   The ALJ then posed a third hypothetical where the same individual could not "sustain concentration, persistence and pace necessary to consistently fulfill work for 8 hours a day, 5 days a week in order to complete a 40-hour workweek."   [#15-2 at 82].   The VE testified that there would be no work for such an individual.   *Id.*   Plaintiff's counsel then questioned the VE as to what jobs would be available to the hypothetical individual with the following limitations: the left arm could not reach and had only 25 percent capacity to perform fine manipulation and grasp, turn, or twist objects; and the right arm had 50 percent reaching capability and 30 percent capacity to perform fine manipulation and grasp, turn, or twist objects.   [#15-2 at 83-84].   The VE testified that the only position available to such an individual is gate guard.   [#15-2 at 84].

The ALJ issued her written decision on January 26, 2010, concluding that Ms. Smith was not disabled.   [#15-3 at 87-103].   Plaintiff requested review of the ALJ's decision, which the Appeals Council granted on February 22, 2011.   [#15-3 at 2).   The Appeals Council vacated the hearing decision and remanded the case on the basis that the decision improperly assigned "great weight" to the opinion of a State Agency Single Decision Maker, whose opinion is entitled to no weight at all.   [#15-3 at 109-110].   The Appeals Council instructed the ALJ on remand to "[g]ive further consideration to the claimant's maximum residual functional capacity during the entire period at issue and provide rationale with specific references to evidence of record in support of assessed limitations."   [#15-3 at 109].

The ALJ held a second hearing on November 16, 2011, at which Ms. Smith testified that, then and earlier, her "real biggest disability is not being able to lift more than 2 pounds." [#15-2 at 40]. The ALJ issued her written decision on January 23, 2012, again concluding that Plaintiff was not disabled. [#15-2 at 9-24]. Ms. Smith requested review of the ALJ's 2012 decision, which the Appeals Council denied on June 26, 2013. [#15-2 at 1-3]. The decision of the ALJ then became the final decision of the Commissioner. 20 C.F.R. § 404.981; *Nielson v. Sullivan*, 992 F.2d 1118, 1119 (10th Cir. 1993) (citation omitted). Plaintiff filed this action on August 29, 2013. The court has jurisdiction to review the final decision of the Commissioner. 42 U.S.C. § 405(g).

## STANDARD OF REVIEW

In reviewing the Commissioner's final decision, the court is limited to determining whether the decision adheres to applicable legal standards and is supported by substantial evidence in the record as a whole. *Berna v. Chater*, 101 F.3d 631, 632 (10th Cir. 1996) (citation omitted); *Pisciotta v. Astrue,* 500 F.3d 1074, 1075 (10th Cir. 2007). The court may not reverse an ALJ simply because she may have reached a different result based on the record; the question instead is whether there is substantial evidence showing that the ALJ was justified in her decision. *See Ellison v. Sullivan,* 929 F.2d 534, 536 (10th Cir. 1990). "Substantial evidence is more than a mere scintilla and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Flaherty v. Astrue,* 515 F.3d 1067, 1070 (10th Cir. 2007) (internal citation omitted). Moreover, the court "may neither reweigh the evidence nor substitute [its] judgment for that of the agency." *White v. Massanari*, 271 F.3d 1256, 1260 (10th Cir. 2001), *as amended on denial of reh'g* (April 5, 2002). *See also Lax v. Astrue*, 489 F.3d 1080, 1084 (10th Cir. 2007) ("The possibility of drawing two inconsistent conclusions from the evidence

does not prevent an administrative agency's findings from being supported by substantial evidence.") (internal quotation marks and citation omitted).   However, "[e]vidence is not substantial if it is overwhelmed by other evidence in the record or constitutes mere conclusion." *Musgrave v. Sullivan,* 966 F.2d 1371, 1374 (10th Cir. 1992) (internal citation omitted).   The court will not "reweigh the evidence or retry the case," but must "meticulously examine the record as a whole, including anything that may undercut or detract from the ALJ's findings in order to determine if the substantiality test has been met." *Flaherty,* 515 F.3d at 1070 (internal citation omitted).   Nevertheless, "if the ALJ failed to apply the correct legal test, there is a ground for reversal apart from a lack of substantial evidence." *Thompson v. Sullivan,* 987 F.2d 1482, 1487 (10th Cir. 1993) (internal citation omitted).

## ANALYSIS

**A.      Ms. Smith's Challenge to ALJ's Decision**

An individual is eligible for DIB benefits under the Act if she is insured, has not attained retirement age, has filed an application for DIB, and is under a disability as defined in the Act. 42 U.S.C. § 423(a)(1).   An individual is determined to be under a disability only if her "physical or mental impairment or impairments are of such severity that [she] is not only unable to do [her] previous work but cannot, considering [her] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy…." 42 U.S.C. § 423(d)(2)(A).   The disabling impairment must last, or be expected to last, for at least 12 consecutive months. *See Barnhart v. Walton*, 535 U.S. 212, 214-15 (2002).   Additionally, the claimant must prove she was disabled prior to her date last insured. *Flaherty*, 515 F.3d at 1069.

The Commissioner has developed a five-step evaluation process for determining whether a claimant is disabled under the Act.   20 C.F.R. § 404.1520(a)(4)(v).   *See also Williams v.*

*Bowen*, 844 F.2d 748, 750-52 (10th Cir. 1988) (describing the five steps in detail). "If a determination can be made at any of the steps that a claimant is or is not disabled, evaluation under a subsequent step is not necessary." *Williams*, 844 F.2d at 750.  Step one determines whether the claimant is engaged in substantial gainful activity; if so, disability benefits are denied.  *Id.*  Step two considers "whether the claimant has a medically severe impairment or combination of impairments," as governed by the Secretary's severity regulations.  *Id.*; *see also* 20 C.F.R. § 404.1520(e).  If the claimant is unable to show that her impairments would have more than a minimal effect on her ability to do basic work activities, she is not eligible for disability benefits. If, however, the claimant presents medical evidence and makes the *de minimis* showing of medical severity, the decision maker proceeds to step three.  *Williams*, 844 F.2d at 750.  Step three "determines whether the impairment is equivalent to one of a number of listed impairments that the Secretary acknowledges are so severe as to preclude substantial gainful activity," pursuant to 20 C.F.R. § 404.1520(d).  *Id.*  At step four of the evaluation process, the ALJ must determine a claimant's Residual Functional Capacity (RFC), which defines what the claimant is still "functionally capable of doing on a regular and continuing basis, despite his impairments: the claimant's maximum sustained work capability."  *Williams*, 844 F.2d at 751. The ALJ compares the RFC to the claimant's past relevant work to determine whether the claimant can resume such work.  *See  Barnes v. Colvin*, No. 14-1341, 2015 WL 3775669, at *2 (10th Cir. June 18, 2015) (internal quotation marks omitted) (citing *Winfrey v. Chater*, 92 F.3d 1017, 1023 (10th Cir. 1996) (noting that the step-four analysis includes three phases: (1) "evaluat[ing] a claimant's physical and mental [RFC]"; (2) "determin[ing] the physical and mental demands of the claimant's past relevant work"; and (3) assessing "whether the claimant has the ability to meet the job demands found in phase two despite the [RFC] found in phase

one.")). "The claimant bears the burden of proof through step four of the analysis." *Neilson*,

992 F.2d at 1120.

At step five, the burden shifts to the Commissioner to show that a claimant can perform

work that exists in the national economy, taking into account the claimant's RFC, age, education,

and work experience. *Neilson*, 992 F.2d at 1120.

> . . . A claimant's RFC to do work is what the claimant is still functionally capable of doing on a regular and continuing basis, despite his impairments: the claimant's maximum sustained work capability. The decision maker first determines the type of work, based on physical exertion (strength) requirements, that the claimant has the RFC to perform. In this context, work existing in the economy is classified as sedentary, light, medium, heavy, and very heavy. To determine the claimant's "RFC category," the decision maker assesses a claimant's physical abilities and, consequently, takes into account the claimant's exertional limitations (i.e., limitations in meeting the strength requirements of work). . . .
>
> If a conclusion of "not disabled" results, this means that a significant number of jobs exist in the national economy for which the claimant is still exertionally capable of performing. However, . . . [t]he decision maker must then consider all relevant facts to determine whether claimant's work capability is further diminished in terms of jobs contraindicated by nonexertional limitations.
> …
>
> Nonexertional limitations may include or stem from sensory impairments; epilepsy; mental impairments, such as the inability to understand, to carry out and remember instructions, and to respond appropriately in a work setting; postural and manipulative disabilities; psychiatric disorders; chronic alcoholism; drug dependence; dizziness; and pain….

*Williams*, 844 F.2d at 751-52. The Commissioner can meet his or her burden by the testimony of

a vocational expert. *Tackett v. Apfel*, 180 F.3d 1094, 1098–1099, 1101 (9th Cir. 1999).

The ALJ first determined that Ms. Smith was insured for disability through December 31,

2007. Next, following the five-step evaluation process, the ALJ determined that Ms. Smith: (1)

had not engaged in substantial gainful activity between the alleged onset date of March 31, 2002

and her date last insured of December 31, 2007; (2) had severe impairments of "degenerative

changes in the lumbar spine [and] a history of breast cancer with associated upper extremity lymphedema"; and (3) did not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in Title 20, Chapter III, Part 404, Subpart P, Appendix 1 (20 C.F.R. §§ 404.1520(d), 404.1525, 404.1526).  At step four, the ALJ found that Plaintiff had residual functional capacity to perform light work as defined in 20 C.F.R. § 404.1567(b), "except that she should have never climbed ladders, ropes or scaffolds and should have occasionally balanced or stooped."  [#15-2 at 14-17].

Ms. Smith objects to the ALJ's decision on the grounds that she failed to properly determine Plaintiff's RFC and the Commissioner did not meet her burden at Step Five.  [#17 at 3, 14-19].

**B.     ALJ's Assessment of Plaintiff's Physical Impairments**

Following the determination that Ms. Smith was not disabled under the Act from March 31, 2002 through the December 31, 2007 last date insured, the ALJ found that Ms. Smith had an RFC to perform light work with the following restrictions: "lifting, carrying, pushing or pulling 20 pounds occasionally and 10 pounds frequently, with no requirement to use the arms to climb ladders, ropes or scaffolds and no more than occasional balancing."  [#15-2 at 21].  The ALJ also found that Plaintiff's "back pathology would have further restricted her to occasional stooping." *Id.*

RFC determinations are for the ALJ to make "based on the entire case record, including the objective medical findings and the credibility of the claimant's subjective complaints." *Poppa v. Astrue*, 569 F.3d 1167, 1170-71 (10th Cir. 2009).  *See also* 20 C.F.R. § 416.946 (providing ALJ is responsible for assessing residual functional capacity).  In reaching her RFC finding, the ALJ considered Plaintiff's medical records for the relevant time period, the opinions

of primary care provider Dr. Gary Jewell recorded outside of the relevant time period, Plaintiff's testimony, and the testimony of Plaintiff's husband.

1. <u>Medical Records</u>

On November 24, 1997, Ms. Smith learned that she had cancer in her left breast. [#15-11 at 620]. She underwent a mastectomy, received chemotherapy, and entered remission. On December 17, 2002, her oncologist, Dr. Charles Zinn, noted after a follow up visit that Plaintiff "is doing quite well…Her energy is good. Her breathing is fine." He also noted that Plaintiff "is not working outside the home, but is busy at home and doing volunteer work at school." [#15-11 at 618]. In May and June of 2003, a mammogram indicated that Ms. Smith had a tumor in her right breast, which a biopsy revealed to be cancer. [#15-9 at 487, 490; #15-11 at 615]. At this time she told her physicians that she was otherwise well and had no complaints [#15-9 at 487; #15-11 at 615].

On June 30, 2003, Ms. Smith underwent a right mastectomy and breast reconstruction. [#15-7 at 315; #15-11 at 613]. On July 9, 2003, Dr. Gregory Liebscher, the plastic surgeon, noted that Plaintiff was having "a little musculoskeletal pain in the back but overall it is covered by the pain medicine." [#15-7 at 315]. Later that month, Dr. Liebscher noted that Plaintiff "is having a lot of problems with being very 'weepy,'" and he instructed her to stop taking Vioxx. [#15-7 at 314]. She then began chemotherapy in early September 2003. During a visit with Dr. Zinn on September 9, 2003, she reported "some aches in the left shoulder posteriorly between the scapula and the spine," but no pain otherwise, and that her spirits were good. [#15-11 at 613]. On September 30, 2003, she told Dr. Zinn that she felt great, her energy was great, and her appetite is "just like normal." [#15-11 at 611]. One month later, she acknowledged feeling nauseated and fatigued, breathing "all right," and sleeping "so-so." [#15-11 at 609]. She

underwent her final cycle of chemotherapy in early December 2003 and reported feeling quite well at that time.  [#15-11 at 605].

In January 2004, Ms. Smith reported no pains or aches; her energy was "pretty good;" and she was breathing and sleeping fine.  [#15-11 at 603].  She also observed effects of sciatica in her left hip, which dated from high school.  [*Id.*]  Plaintiff began seeing internist Dr. Robert Spees in April 2004.  He recorded that Plaintiff had L arm Lymphedema and prescribed a sleeve for her, he also recorded that she was feeling sad.  [#15-10 at 520, 521].  He ordered imaging studies of Ms. Smith's low back, which showed degenerative changes at the bottom of the lumbar spine and at the bottom of the mid back.  [#15-10 at 523, 525, 556].  The same month, Ms. Smith reported to Dr. Zinn lower joint pain and pain along her left leg through her toes.  [#15-11 at 601].  However, she also stated that her "energy is great" and she is walking.  [*Id.*]  On a patient form, she represented that she had "no problems getting around."  [#15-10 at 522].  In June 2004, Ms. Smith observed to Dr. Zinn that she felt well, her "energy is okay," she had gained some weight and had begun walking "approximately two hours a day."  [#15-11 at 599].

On July 6, 2004, following genetic counseling, Ms. Smith underwent a hysterectomy and oophorectomy.  [#15-8 at 352; #15-9 at 476].   Dr. Roy Stringfellow, her surgeon, advised on August 16, 2004 that she could return to normal activities.  [#15-9 at 458].  During a November 12, 2004 appointment, Dr. Spees noted the presence of LUE Edema, lymphedema L arm, low back pain, and sciatica.  [#15-10 at 516, 517].

Ms. Smith visited Dr. Zinn six months later in December 2004 and reported feeling well, "sleeping all right," and having good energy with no aches or pains.  [#15-11 at 597].  In March 2005, Dr. Zinn recorded that Ms. Smith "is feeling 'pretty good,'" had "some pain in her right forearm [that] cleared with an aircast," and "some achy tired feeling in the posterior upper back."

[#15-11 at 595].  She also reported that her energy is "pretty good and had been a bit low," that she tires after shopping more than before.  *Id.*  Dr. Zinn observed her as "a well-developed, well-nourished, healthy appearing, 47-year-old lady, alert, pleasant, and in no acute distress."  *Id.*  Plaintiff complained to Dr. Sprees of left hip pain in May 2005 and of a cough and shortness of breath in June 2005.  [#15-10 at 508, 510].  In July 2005, Ms. Smith reported feeling well, specifically she was not as tired and felt stronger.  [#15-11 at 593].

During her November 2005 visit with Dr. Zinn, Ms. Smith reported that her energy was good and she was exercising, but that lengthy shopping would leave her tired for two days.  [#15-11 at 591].  She observed no aches or pains.  *Id.*  In March 2006, she complained only of lightheadedness, likely caused by one of her prescription medications.  [#15-11 at 589].  She still felt energized, was breathing and sleeping fine, and reported exercising for two hours a day, six days a week.  *Id.*  She observed no aches or pains.  *Id.*  As of August 8, 2006, Ms. Smith was exercising daily and feeling "fairly well" and energized.  [#15-11 at 587].  She stated that walking rapidly left her short of breath.  *Id.*

As of November 2006, Ms. Smith reported no concerns to Dr. Sprees [*see generally* #15-10 at 504] and told Dr. Zinn that she had no new complaints and was "getting lots of exercise."  [#15-11 at 585].  In January 2007, she complained to Dr. Sprees of shortness of breath and he recommended she participate in a sleep study [#15-10 at 502-503], which revealed that she had sleep apnea  [#15-8 at 323-324, 329].  Ms. Smith stopped seeing Dr. Sprees in early 2007 when her insurance changed and began seeing Dr. Robert Ridley.  [#15-12 at 764].  Dr. Ridley noted that Plaintiff "has hypertension that is currently controlled with Lisinopril/hydrochlorothiazide," her "hyperlipidemia is controlled with Lovastatin…[h]er depression is controlled with Effexor 75 mg 1 t.i.d, and her chronic degenerative disk disease and sciatic pain is treated with Tramadol

and Norflex," and she has "chronic insomnia, for which Ambien CR is used nightly." [#15-12 at 764].

In February 2007, she reported the diagnosis of sleep apnea to Dr. Zinn and that she was exercising less, experiencing "a little fatigue," but had no aches or pains. [#15-11 at 583]. Dr. Zinn observed that Plaintiff "remains very busy taking care of her family and her home. She is on the go quite a bit. She does get quite a bit of exercise just doing those normal chores." *Id.* Around this time, Dr. Ridley referred Ms. Smith to a nephrologist because routine blood work had shown an elevated creatinine level, indicative of reduced renal (kidney) function. [#15-12 at 764]. In March 2007, Dr. Brad Yuan, nephrologist, diagnosed Plaintiff with stage II chronic kidney disease. [#15-12 at 727-728]. In April 2007, Dr. Zinn recorded that Ms. Smith felt "much better," had increased her exercise, was sleeping well, and other than a twisted ankle was not experiencing pain. [#15-11 at 581].

Several months later, in July 2007, Ms. Smith reported feeling "fantastic." Dr. Zinn recorded that "[s]he has no complaints. Her energy is wonderful…Breathing is fine…She is sleeping well." [#15-11 at 579]. In September 2007, Plaintiff saw Dr. Gary Jewell, who practiced with Dr. Ridley. Dr. Jewell noted that Plaintiff's depression was stable without medications, she was sleeping with Ambien, and she reported no joint or muscle pain. [#15-12 at 758-759]. By late January of 2008, Ms. Smith reported that she was generally well but concerned about an increase in loss of memory. [#15-11 at 577]. Dr. Zinn recorded that her energy "is pretty good. She is up and about and on the go." *Id.* Plaintiff reported pain in her knees, particularly the right one which she had just injured. *Id.* She was using a CPAP machine for her sleep apnea and "sleeping alright." *Id.*

Following a review of these records, the ALJ determined that Ms. Smith could perform light work as defined in 20 C.F.R. 404.1567(b) with limitations of never climbing ladders, ropes, or scaffolds, and only occasionally balancing or stooping. Ms. Smith argues that the ALJ failed to consider the combined effect of her impairments, in particular "the effects of her cervical spinal stenosis, thoracic DJD, chronic kidney disease…sleep apnea, sleep disorder, and mood swings," and cites to her testimony during the decision hearing for support. [#17 at 16]. This court respectfully disagrees.

The ALJ determined that the degenerative changes in Plaintiff's lumbar spine and her history of breast cancer with associated upper extremity lymphedema were severe impairments. [#15-2 at 15]. However, the ALJ subsequently found that, based on the medical records, Ms. Smith's spinal condition and lymphedema did "not establish the degree of joint deformity, nerve damage, muscle weakness, and inability to ambulate or use the arms effectively that is required to meet Listing 1.00 ff. for orthopedic impairments." [#15-2 at 16]. As for Plaintiff's history of breast cancer, the ALJ gave "specific consideration…to Listing 13.00 ff," but found the medical records indicated Plaintiff responded well to the oncology treatment and had been in remission since 1998 for cancer of the left breast and since 2003 for cancer of the right breast. *Id.*

The ALJ then determined that Ms. Smith's remaining impairments could not be defined as severe under the statute as follows: the partial kidney failure "posed no more than minimal functional limitations during the period under review"; osteoarthritis of the knees was first mentioned in the record on January 2008 and the record indicates that Plaintiff "retained full range of motion in both knees, without effusion or instability"; her symptoms of depression were observed as "stable" through the date last insured, and notes following that date indicate that worsening symptoms were quickly controlled with medication; and treatment records fail to

demonstrate any "vocationally limiting symptoms" associated with Plaintiff's sleep apnea.  [#15-2 at 15-16].  To the extent Ms. Smith argues the ALJ was required to solicit additional remarks from Dr. Jewell [#17 at 17], the ALJ adequately explained at the hearing and in her final decision that further observations by the doctor were unnecessary because the record already included his notes following the one examination he performed of Plaintiff prior to the date last insured.  [#15-2 at 20, 35-36 ("the only time frame I can look at [Dr. Jewell] already addressed")].[2] Furthermore, "it is not the rejection of the treating physician's opinion that triggers the duty to recontact the physician; rather it is the inadequacy of the 'evidence' the ALJ 'receive[s] from [the claimant's] treating physician' that triggers the duty." *White v. Barnhart*, 287 F.3d 903, 908 (10th Cir. 2001) (quoting 20 C.F.R. § 416.912(e)).  Finally, Ms. Smith contends the ALJ applied the wrong standard for assessing RFC because she referenced the volunteer work Plaintiff engaged in around 2002 without describing the work, and stated that because Plaintiff was a "younger individual, she has to either meet a listing or we had to be able to make a finding that she was completely unable to [] sustain any work activity at all."  [#17 at 21 citing #15-2 at 38-39].  However, as the record demonstrates, the ALJ relied almost entirely on the notes and reports of Plaintiff's physicians in assessing the RFC; and any consideration given to Plaintiff's volunteer activities was in conjunction with her other daily activities, such as participating in her children's carpool, attending her daughter's performances, going to church, and visiting the movies.  [*See* #15-2 at 17].

The ALJ accommodated Ms. Smith's back pain by imposing the restriction of occasional stooping; and accommodated the lymphedema, neck pain, and problems lifting heavy objects by imposing the restriction of lifting 20 pounds occasionally and 10 pounds frequently.  The ALJ's

---

[2] Dr. Jewell retired prior to the November 2011 hearing, and required $650 from Plaintiff to review his analysis or provide further information.  [#15-2 at 35-36].

summary and discussion of Plaintiff's medical records and treatment demonstrates her consideration of the relevant medical evidence.

2. Dr. Jewell's 2009 Assessment

Treating physicians are "likely to be the medical professionals most able to provide a detailed, longitudinal picture of [the] medical impairment(s)..." 20 C.F.R. § 404.1527(c)(2).  And their opinions are thus accorded controlling weight *if* "the opinion is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record." *Id.*  An ALJ may reject medical opinions in the record and reach her own conclusion as to a claimant's RFC so long as that conclusion is based on substantial evidence. *See Boss v. Barnhart*, 67 Fed. Appx. 539, 542 (10th Cir. 2003); *Eggleston v. Bowen,* 851 F.2d 1244, 1247 (10th Cir. 1988) (ALJ may resolve conflicting medical evidence); *cf. Moon v. Barnhart*, 159 F. Appx. 20, 22–23 (10th Cir. 2005) (finding an RFC assessment was not based on substantial evidence where ALJ adopted an opinion that tempered two physicians' medical opinions without explaining what credible evidence he used to reject the doctors' opinions or what evidence supported his RFC).  In evaluating medical opinions, the ALJ should consider the following factors:

> (1) the length of the treatment relationship and the frequency of examination; (2) the nature and extent of the treatment relationship, including the treatment provided and the kind of examination or testing performed; (3) the degree to which the physician's opinion is supported by relevant evidence; (4) consistency between the opinion and the record as a whole; (5) whether or not the physician is a specialist in the area upon which an opinion is rendered; and (6) other factors brought to the ALJ's attention which tend to support or contradict the opinion.

20 C.F.R. § 404.1527; *see also Oldham v. Astrue*, 509 F.3d 1254, 1258 (10th Cir. 2007).

Dr. Jewell began treating Ms. Smith as late as February 2007, saw her twice before the date last insured, and examined her for the first time in September 2007.  [*See* #15-12 at 744-

767].  At that time, he noted that Plaintiff engaged in weekly exercise appropriate for her age and health, had normal energy, no change in appetite, no shortness of breath, no joint complaints or muscle complaints, and her symptoms of depression were stable without medication.  [#15-12 at 758-759].

Two years later, in October 2009, Dr. Jewell completed a physical residual functional capacity questionnaire representing that he had treated Ms. Smith since 1999, saw her every three months, and had diagnosed diabetes, cervical spinal stenosis, kidney disease, lumbar degenerative disc disease, sleep apnea, mood swings, and gastroesophageal reflux disease.  [#15-13 at 835-838].  He opined that Ms. Smith could walk one block without rest or severe pain, sit for 45 minutes at a time and for approximately four hours in an eight-hour workday, stand for 15 minutes at a time and stand or walk for approximately two hours in an eight-hour work day, and walk for fifteen minutes every 45 minutes.  [#15-13 at 836-837].  He further opined that Ms. Smith requires a job that allows her to shift positions from sitting, walking, or standing at will, and to take unscheduled breaks during the workday of fifteen minutes every 30 to 45 minutes. [#15-13 at 837].  Dr. Jewell noted that Plaintiff should occasionally lift ten pounds and never left more than 20 pounds, can frequently look down, should only occasionally turn head left or right, and should rarely look up of hold her head in a static position.  *Id.*  He further noted that Plaintiff has significant limitations with reaching, handling or fingering, could occasionally twist and stoop, but should rarely crouch, climb ladders, or climb stairs.  [#15-13 at 838].  Finally, Dr. Jewell opined that Ms. Smith's impairments produced "good days" and "bad days," that as a result she would likely be absent from work "about four days per month," and that she was "[i]ncapable of even 'low stress' jobs."  [#15-13 at 836, 838].

The ALJ took issue with the fact that Dr. Jewell saw Ms. Smith twice and examined her once prior to the last date insured, and that both visits "were for regular follow-up and medication refills, and resultant physical examinations were essentially normal." [#15-2 at 20]. The ALJ noted that the physical residual functional capacity questionnaire was presented in a "check box" format, with the typed notice that the assessment "applied to 12/31/2007." [*See* #15-2 at 20; #15-13 at 835]. The ALJ also noted that Dr. Jewell "failed to provide any narrative explanation to accompany his severe restrictions," and "failed to mention the diagnoses of lymphedema or breast cancer when citing the claimant's limitations." [#15-2 at 20]. The ALJ concluded that "most of the diagnoses cited by Dr. Jewell are not substantiated within the record prior to the date last insured, or are not considered severe prior to the date last insured," and were "not well supported by acceptable clinical findings." *Id.* Accordingly, the ALJ accorded the doctor's opinions "very limited weight, and only to the extent he advised occasional stooping and even less climbing of ladders." *Id.*

Ms. Smith argues the ALJ failed to develop the record as to Dr. Jewell's diagnoses and opinion, "resulting in a disregard of many of [her] diagnoses and the basis for his opinion." [#17 at 22]. The court again respectfully disagrees. The ALJ considered the record as a whole and found that Dr. Jewell's opinion was inconsistent with Plaintiff's medical history and personal narrative, as recorded by her physicians. *See White*, 287 F.3d at 907-08 (court's rejection of a treating physician's opinion was appropriate where limited examinations did not support a restrictive functional assessment, the opinion was inconsistent with the findings of consulting physicians, and the treatment relationship was relatively brief); *see also Oldham*, 509 F.3d at 1258 (holding ALJ's citation to "contrary, well-supported medical evidence" in the record satisfies the requirement that the ALJ's decision be "'sufficiently specific to make clear to any

subsequent reviewers the weight the adjudicator gave to the [medical opinion] and the reasons for that weight.'") (citation omitted).   The ALJ's analysis of Dr. Jewell's reports satisfies the legal standard under 20 C.F.R. § 404.1527(c)(2) that she give "good reasons…for the weight [she] give[s] [the] treating source's opinion."

    3.  <u>The Testimony of Mr. and Mrs. Smith</u>

"A claimant's subjective allegation of pain is not sufficient in itself to establish disability. Before the ALJ need even consider any subjective evidence of pain, the claimant must first prove by objective medical evidence the existence of a pain-producing impairment that could reasonably be expected to produce the alleged disabling pain." *Thompson v. Sullivan,* 987 F.2d 1482, 1488 (10th Cir. 1993) (citations omitted).   The ALJ was required to consider all the relevant objective and subjective evidence and "decide whether [s]he believe[d] the claimant's assertions of severe pain," *Luna v. Bowen,* 834 F.2d 161, 163 (10th Cir. 1987).   "Findings as to credibility should be closely and affirmatively linked to substantial evidence...." *Huston v. Bowen,* 838 F.2d 1125, 1133 (10th Cir. 1988). "Credibility determinations are peculiarly the province of the finder of fact, [however,] and we will not upset such determinations when supported by substantial evidence." *Diaz v. Secretary of Health & Human Servs.,* 898 F.2d 774, 777 (10th Cir. 1990).

The ALJ considered Plaintiff's testimony that she could not sustain employment because she felt fatigued, suffered from pain in her arms and back, and was severely limited in the use of her arms.  [#15-2 at 17-19].  The ALJ then reviewed the medical evidence of, treatment received for, and Plaintiff's reports and observations regarding the maladies and pain. *Id.* She concluded that "[n]one of these findings supports the claimant's allegations of extreme fatigue from her alleged disability onset date through her date last insured"; and the evidence fails to support

Plaintiff's contention that she was "severely limited in her ability to lift and carry, and was beset by upper extremity pain throughout the period under consideration." [#15-2 at 18]. The ALJ also concluded that, with regard to Plaintiff's chronic back pain, "[n]one of these findings supports the claimant's statements regarding an inability to sit, stand, or walk for more than minimal periods," and "she was treated in a most conservative manner, with medication only, and was not referred for specialist care, physical therapy or even epidural injections." [#15-2 at 19].

For example, treatment notes for the periodic doctor visits following Ms. Smith's chemotherapy treatment show she generally "had good energy, appetite, and sleep pattern." [#15-2 at 18]. And, in July 2007 "just five months prior to the date last insured [Ms. Smith] reported she was feeling 'fantastic.'" *Id.* As for Plaintiff's lymphedema, "the clinical findings show intact skin that was soft and healthy in appearance, with no variation in temperature or color from the opposite extremity and no pitting or decreased mobility"; indeed, "[c]omplaints of lymphedema are absent from the evidence through April 2008—four months after [Ms. Smith] last met the eligibility requirements for disability insurance benefits." *Id.* With regard to back pain, Plaintiff first voiced a complaint in April 2004, was prescribed pain medication in October 2004, and through January 2007 expressed no other complaints. [#15-2 at 19]. "Through the date last insured, the last mention of back pain dates to February 2007, when [Ms. Smith] said her back pain was managed with medication alone." *Id.* Finally, though Plaintiff testified that her "biggest disability [was] not being able to lift more than 2 pounds," [#15-2 at 40], she never voiced such complaints to her doctors during the relevant time period. The ALJ concluded, "[d]espite claiming extreme limitations in exertional capacities and stamina, the record provides

no consistent and convincing evidence over time, and the undersigned cannot find the testimony and alleged limitations of the claimant to be well supported." *Id.*

As for Mr. Smith, the ALJ considered his testimony as that of a nonmedical professional, and noted that he "did not provide exacting observations as to dates, frequencies, types and degrees of medical signs and symptoms." [#15-2 at 21]. The ALJ found that Mr. Smith's testimony best conformed to his wife's treatment records for the September through December 2003 treatment of chemotherapy, rather than to the entire period under consideration. *Id.* The ALJ declined to accord any weight to Mr. Smith's testimony because it was "simply not consistent with the preponderance of the evidence, which shows a good result with treatment for cancer of the right breast and minimal complaints and treatment for her back issue." [#15-2 at 21-22]. The ALJ's evaluation of Plaintiff's subjective complaints and her husband's accompanying testimony is supported by substantial evidence in the record.

4. The Date of Onset of Disability

Ms. Smith argues that the ALJ erred in failing to find that she was disabled for a specific period of time following her chemotherapy, despite the Smiths' testimony regarding Plaintiff's work history. [#17 at 18-19]. The ALJ may award a finite period of disability if the claimant proves she was unable to perform work for twelve consecutive months prior to her date last insured. *See* 42 U.S.C. § 423(d)(2)(A). *See also Shepherd v. Apfel*, 184 F.3d 1196, 1199 n.2 (10th Cir. 1999). Support for a period of disability must include a related functional loss that precludes substantial gainful work for at least twelve continuous months. 20 C.F.R. §§ 404.1505(a), 404.1529(c).

First, the ALJ here determined from Ms. Smith's medical records that she was in good health as of 1998, following the treatment for the cancer in her left breast. [#15-2 at 18].

Second, the ALJ considered that, while the alleged onset of disability is March 31, 2002, Dr. Zinn reported in December 2002 that Plaintiff "is doing quite well…Her energy is good.  Her breathing is fine," and she "is not working outside the home, but is busy at home and doing volunteer work at school."  [#15-11 at 618].   The cancer in Ms. Smith's right breast was not discovered until May 2003, and in June 2003 she underwent a right mastectomy and breast reconstruction.  [#15-7 at 315; #15-11 at 613].   She began chemotherapy treatment in September 2003, and by January 2004 reported no pains or aches, that her energy was "pretty good," and that she was breathing and sleeping fine.  [#15-11 at 603].  Plaintiff's isolated reports of fatigue or shortness of breath are insufficient to establish disability.  She must show that her impairments were so severe as to preclude any substantial gainful employment.  *Cf. Brown v. Bowen*, 801 F.2d 361, 362-63 (10th Cir. 1986) ("[D]isability requires more than mere inability to work without pain. To be disabling, pain must be so severe, by itself or in conjunction with other impairments, as to preclude any substantial gainful employment." (quotation and citation omitted).   Simply because Plaintiff chose not to work outside the home during the period in question is not conclusive that she was unable to do so.  The ALJ reasonably concluded that Plaintiff had not proven a finite period of disability prior to the last insured date.

   5. The Appeals Council's Remand Order

   Ms. Smith contends that the ALJ gave "a pro forma nod" to the remand order and found that she had a light RFC anyway.  [#17 at 20].  As addressed above, there is substantial support in the record for the ALJ's findings and determination regarding Ms. Smith's RFC without consideration of the State Agency Single Decision Maker, whose opinion the ALJ expressly declared should receive no weight.  [#15-2 at 19].  Nor was the ALJ required to attach her determination to the opinion of a physician.  *Chapo v. Astrue*, 682 F.3d 1285, 1288 (10th Cir.

2012) ("there is no requirement in the regulations for a direct correspondence between a[] [residual functional capacity] finding and a specific medical opinion on the functional capacity in question.")  I find that the ALJ considered the entire period at issue and provided rationale with specific references to the evidence of record in supporting her determination of Plaintiff's limitations.

**C.     The ALJ's Determination at Step Five**

Ms. Smith argues that the ALJ failed to consider the combined effect of all of her impairments, which precluded the ALJ from presenting accurate hypotheticals to the VE that accounted for her pain, memory problems, depression, and knee and back pain. [#17 at 25].  For the reasons stated above, the court finds that the substantial evidence supports the ALJ's classification of Plaintiff's impairments and assessment of RFC.  Furthermore, the ALJ posed hypotheticals that included the limitations she found credible.  *See Qualls v. Apfel*, 206 F.3d 1368, 1373 (10th Cir. 2000) ("The ALJ propounded a hypothetical question to the VE that included all the limitations the ALJ ultimately included in his RFC assessment. Therefore, the VE's answer to that question provided a proper basis for the ALJ's disability decision") (citation omitted).

**CONCLUSION**

The court is satisfied that the ALJ considered all relevant facts and that the record contains substantial evidence from which the Commissioner could properly conclude under the law and regulations that Ms. Smith was not disabled within the meaning of Title II of the Social Security Act and therefore not eligible to receive Disability Insurance Benefits.  Accordingly, IT IS ORDERED that the Commissioner's final decision is AFFIRMED and this civil action is DISMISSED, with each party to bear her own fees and costs.

DATED: September 24, 2015                    BY THE COURT:


                                             s/ Nina Y. Wang_____
                                             Nina Y. Wang
                                             United States Magistrate Judge